## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TEKLE TSEHAYE,**

  **Plaintiff,**

  **v.**

**WILLIAM C. SMITH & CO., INC.,**

  **Defendant.**

**Civil Action No.  03-1795 (JDB)**

### MEMORANDUM OPINION

Plaintiff Tekle Tsehaye brings this discrimination action pursuant to the District of

Columbia Human Rights Act ("DCHRA")  and 42 U.S.C. § 1981 against defendant William C.

Smith & Co., Inc. ("Smith"), asserting claims of discrimination and retaliation based on race and

national origin.  Presently before the Court is Smith's motion for summary judgment.  For the

reasons stated below, the Court will grant Smith's motion for summary judgment.

### BACKGROUND

Smith is a residential property management company headquartered in Washington, D.C.

Def.'s Statement of Undisputed Facts at 1 ¶ 1 ("Def.'s Statement").  In 1995, Tsehaye, an

Ethiopian male, began working for Smith as a full-time janitor in an apartment building located

at 2701 Connecticut Avenue, NW ("2701").  Id. at 2.  2701 contains approximately 71 units.  Id.

As part of his compensation package, Tsehaye was permitted to live in 2701 without paying rent.

Pl.'s Exh. 20.  In his capacity as janitor, Tsehaye was responsible for vacuuming, dusting

common areas, mopping stairways, preparing vacant apartments for occupancy, and similar

tasks.  Def.'s Statement at 1-2 ¶ 2.  Tsehaye was also hired to perform landscaping duties for

2701.  See Tsehaye Aff. at 1-2; see also Pl.'s Statement of Genuine Issues of Material Facts

Necessary to be Litigated at 1 ¶ 2, 3 ¶ 9 ("Pl.'s Statement").

For the first seven years of his employment at 2701, Tsehaye was only loosely

supervised.  Def.'s Statement at 2 ¶ 3.  This laissez-faire approach to employee management was

the direct result of an unfortunate combination of employee turnover, illness, and death at the

supervisory levels of 2701.  Id. at ¶¶ 3, 5, 8, 10.  In April of 1997, a new Resident Manager, John

Horan, was hired and became Tsehaye's supervisor.  Id. at ¶ 5.  In January of 1998, Horan also

assumed the duties of Property Manager, which required him to manage several properties on a

full-time basis while still acting as 2701's Resident Manager part-time.  Id. at ¶ 5.  Jane Loos

took over as the on-site Resident Manager in October 2001, enabling Horan to work solely as

Property Manager and to operate off-site from Smith's headquarters.  Id. at ¶ 6.  As Property

Manager, Horan was responsible for maintaining and evaluating the expenses and financial

allotments of his properties, overseeing staff management at those properties, and monitoring the

condition of those properties.  Id. at ¶ 5.

Shortly after Loos took over, she was diagnosed with terminable cancer and was unable

to perform the full functions of her job as Resident Manager, which left Tsehaye and the other

2701 employees without much direct oversight.  Id. at 3 ¶ 8. Loos became incapacitated in

October 2002, and Smith did not hire a replacement until March 25, 2003.  Id. at ¶¶ 8, 11, 12.  At

this time, Smith employed only one full-time employee in addition to Tsehaye:  an African

American man by the name of Louis Carter.  Id. at ¶ 12.  Carter was employed as a Maintenance

Engineer, and as such was responsible for making repairs in both occupied and unoccupied units,

mostly regarding electrical, heating, and carpentry problems.  Id.  A part-time janitor named Jose

Ramos, of Hispanic origin, was also employed at 2701 beginning in early 2002.  Pl.'s Statement

at 4 ¶ 22.  At this time, Ramos worked four hours per day at 2701.  See Plaintiff's Memorandum
in Opposition to Defendants Motion for Summary Judgment at 27 ("Pl.'s Mem. Opp'n"); see also
Pl.'s Exh. 12.

On March 25, 2003, Smith hired Susan Petree to replace Loos.  Def.'s Statement at 3 ¶
12.  Petree's management style stood in marked contrast to those of Loos and Tsehaye's previous
supervisors.  Petree ran a tight ship, keeping close tabs on the whereabouts of employees, the
hours they worked, and how quickly and thoroughly they completed their assignments.  See id.
at 4 ¶ 14.  She instituted several new policies and procedures, including one that required
employees to complete timesheets on a daily basis in order to detail their work hours.  Id.  She
also instituted the use of checklists to ensure that employees completed their tasks in a
satisfactory manner.  Id.

From the start, Petree and Tsehaye became embroiled in an intense personality conflict.
Petree found Tsehaye to be insubordinate, unresponsive and difficult, and described his job
performance as poor.  Id. at ¶¶ 14-15.  Tsehaye claims that Petree treated him "like a stinking
dog", Plaintiff's Complaint at 9 ¶ 40 ("Pl.'s Compl."), by:  (1) behaving in an unfriendly manner
toward both Tsehaye and his wife, see Pl.'s Statement at 6 ¶ 38; (2) displaying affection for every
employee at 2701 but Tsehaye, see id. at 6-7 ¶ 39; (3) paging Tsehaye incessantly, Pl.'s Compl.
at 4 ¶ 18; (4) requiring Tsehaye to re-perform tasks that Tsehaye urges he had already completed
in a timely and satisfactory fashion, see id. at 8 ¶ 37; (5) yelling at Tsehaye and pointing her
fingers in his face, id. at 6-7 ¶ 27, 28; (6) forcing Tsehaye to clean up after other employees, id.
at 8 ¶ 37; (7) requiring Tsehaye to work later than he was originally scheduled to work, Pl.'s
Compl. at 4 ¶ 18; see also Pl.'s Statement at 7 ¶¶ 40-41; (8) physically jostling Tsehaye in an

aggressive fashion, Pl.'s Compl. at 6 ¶ 27; and (9) generally pestering him in an unpleasant manner, see id. at 4-6; see also Pl.'s Statement at 7 ¶¶ 40-42.

The record establishes that Petree issued a series of memoranda to Tsehaye, citing various inadequacies regarding his performance.  See Pl.'s Exh. 23, 24, 40; Def.'s Statement at 5 ¶¶ 18-22.  These memoranda generally asked Tsehaye to be more responsive, to be more efficient, to complete his tasks in a proper fashion, and to stop arguing with Petree and resisting her authority.  See Pl.'s Exh. 23, 24, 40; Def.'s Statement at 5 ¶¶ 18-22.  Tsehaye was never suspended or demoted as a direct result of these memoranda.  See Def.'s Statement at 6 ¶ 23.

Horan had received several complaints about Petree's behavior, from both Tsehaye and Carter.  Horan Tr. at 44-45, 54-55, 71; Carter Tr. at 38.  In fact, Horan himself has described Petree as "rude," "insubordinate," and "argumentative."  Horan Tr. at 39-40, 83.  Because Tsehaye and Petree were so openly unable to function in a working relationship, Horan became involved.  Horan held a meeting with Tsehaye and Petree on May 21, 2003 in an attempt to mediate their differences.  See Horan Tr. at 45-46; Petree Tr. at 86-90.  However, this meeting proved unproductive, as it quickly became confrontational and escalated to Tsehaye storming out of the room.  See Horan Tr. at 54; Carter Tr. at 72-73; Petree Tr. at 88-89.  Tsehaye alleges that he explicitly accused Petree of discrimination at this meeting.  Tsehaye Aff. at 11-12 ¶ 35; Pl.'s Statement at 9 ¶ 47.

Six days later, Tsehaye filed a discrimination complaint with Carol Longmore, a Human Resource Generalist in Smith's Human Resources Department, regarding the way Petree treated him.  Pl.'s Statement at 10 ¶ 51; see also Longmore Tr. at 32-33; Horan Tr. at 65-66; Tsehaye Tr. at 164-68.  Horan was present when the complaint was filed, and was aware that Tsehaye was complaining of discrimination.  Tsehaye Aff. at 12 ¶ 37; Longmore Tr. at 39.  According to

Longmore, Tsehaye said that he did not care for the way Petree had treated him, stating that Petree had pushed him, shouted at him, and interrupted him while he was speaking at the May 21 meeting.  Longmore Tr. at 37-38.  Tsehaye's complaint made its way to Smith's Human Resources Director, Bob Grzesik, who held a meeting with both Petree and Tsehaye on May 29, 2003.  Longmore Tr. at 33, 51-54; see Tsehaye Tr. at 173-75.  Grzesik told Tsehaye that Petree was his superior and, thus, he must follow her orders.  Longmore Tr. at 52-53, 55.  Tsehaye alleges that on or about May 28, 2003, Petree promised to fire him for having complained about her.  Pl.'s Compl. at 8 ¶ 35; Pl.'s Statement at 11 ¶ 52; see also Tsehaye Aff. at 12-13 ¶ 38.  On June 9, 2003, Petree called Tsehaye a "dumb Ethiopian who did not know his rights" and stated that "all Ethiopians are dumb or ignorant."  Pl.'s Statement at 11 ¶ 58; see also Pl.'s Compl. at 10 ¶ 44.

On June 5, 2003, Horan was replaced by Craig Channell, the Vice President and Director of Operations at Smith.  Ritz Decl. at  3 ¶ 11; Channell Tr. at 23, 35-36.  John Ritz, the President of Smith, had reviewed the proposed 2003 budget for 2701 in late October/early November of 2002 and began questioning whether the property was overstaffed.  Ritz Decl. at 4 ¶ 12.  However, this was during Loos' illness, and Ritz did not think that it was an appropriate time to downsize.  Id.  But when Ritz appointed Channell to replace Horan, he thought the time ripe for a complete review of the budget and staffing operations of 2701, and directed Channell to undertake such an analysis.  Ritz Decl. at 3 ¶ 11.  Channell was asked to review the entire operation of the building, including its personnel, payroll, leasing, financial performance, and physical condition.  Id. When Channell's review was complete, he determined that, in light of 2701's size, payroll costs were unduly high and thus the actual earnings of 2701, as compared to its expected earnings, were unsatisfactory.  Channell Tr. at 94-96.  The two Smith properties that

were most comparable in size to 2701 maintained payroll costs per month per unit of approximately twenty and thirty dollars less than those of 2701, although those properties actually had more units than 2701.  Ritz Decl. at 4 ¶ 13.

Petree primed Channell on her assessment of Tsehaye's attitude and job performance. Def.'s Statement of Undisputed Facts at 8 ¶ 33.  Notwithstanding Petree's statements, or the financial assessment of 2701, Channell decided to let Tsehaye remain in his position to give him "time to improve his work performance and learn to work with Petree."  Id.; see Channell Tr. at 54.  But as he observed the situation at 2701, Channell became concerned about Tsehaye's attitude and performance.  Channell Tr. at 61-64.  Channell instructed Petree to tell Tsehaye to clean the building and to perform his other tasks more frequently and thoroughly.  Chanell Tr. at 61-64.  On June 20, 2003, Channell held a meeting with Tsehaye, during which he explained that Petree was Tsehaye's superior and Tsehaye was required to follow Petree's instructions.  Tsehaye Tr. at 193-200.   Channell also gave Tsehaye a formal letter to this effect, which clearly expressed Channell's views that 2701 did not need two full-time employees and that Tsehaye's position would likely be the one reduced to a part-time schedule.  Pl.'s Exh. 25.

According to Channell, Tsehaye's job performance did not improve.  On one notable occasion in July 2003, Channell and Tsehaye worked together to prepare a vacant apartment for occupancy.  When Channell asked Tsehaye to clean the bathroom, Tsehaye responded that he had already done so and did not intend to do it a second time.  Channell Tr. at 101.  Channell proceeded to clean the bathroom himself, and Tsehaye eventually took over.  Channell Tr. at 101.  For Channell, this was the proverbial last straw, prompting him to conclude in early July that Tsehaye would have to be terminated.  Channell Tr. at 55.

Tsehaye's treating physician diagnosed him with job related stress, anxiety, and insomnia on July 11, 2003, after which Tsehaye took ten days of medical leave.  Pl.'s Statement at 13 ¶ 64; Pl.'s Exh. 29.   Three days later, Ramos' work schedule was doubled, making him a full-time employee at 2701, and he took over Tsehaye's duties.  Pl.'s Statement at 13 ¶ 66; Pl.'s Exh. 12. On July 21, 2003, Channell instructed Petree to direct Tsehaye to obtain his doctor's clearance before he would be permitted to resume his employment duties.  Pl.'s Exhibit 30.  On July 22, 2003, Channell informed Tsehaye that his employment was terminated, Tsehaye Tr. at 21-22; Pl.'s Exh. 31, notwithstanding the fact that Tsehaye had obtained the requisite doctor's clearance, see Pl.'s Statement at 13¶ 68; Pl.'s Exh. 28.  Tsehaye states that Petree issued a memorandum terminating his employment on June 19, 2003, but concedes that Channell prevented Petree from giving it to Tsehaye because Petree had no authority to fire Tsehaye.  Pl.'s Statement at 12 ¶ 60; see also Pl.'s Exh. 42.

Smith has moved for summary judgment, alleging that even if all of Tsehaye's assertions are true, Tsehaye has not proven conduct that rises to the level of legally cognizable harm based on racial discrimination or retaliatory action under the applicable statutes.  For the reasons discussed herein, the Court finds that summary judgment in favor of Smith is warranted.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of demonstrating the absence of any genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

To determine whether a genuine dispute of material fact sufficient to preclude summary judgment exists, the court must take the non-movant's assertions as true, accepting all evidence and drawing all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than a "mere existence of a scintilla of evidence" in support of its position. Id. at 252. A movant may successfully obtain summary judgment by pointing to the absence of evidence proffered by the non-moving party. Celotex, 477 U.S. at 322. "If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252; see also Holbrook v. Reno, 196 F.3d 255, 259-60 (D.C. Cir. 1999).

## II.    Legal Framework Under DCHRA

The District of Columbia, for alleged violations of DCHRA, has "adopted the Supreme Court's approach in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the seminal case establishing the burden of proof in employment discrimination cases under Title VII." Miller v. American Coalition of Citizens with Disabilities, 485 A.2d 186, 189 (D.C. 1984). Similarly, alleged violations of § 1981 are addressed under the McDonnell Douglas framework. Murray v. Gilmore, 406 F.3d 708, 713 (D.C. Cir. 2005). Under this framework, the plaintiff has the burden of establishing a prima

facie case of discrimination or retaliation by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802; see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or non-retaliatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production. Burdine, 450 U.S. at 254-55.  The employer "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Id.

If the employer successfully articulates a nondiscriminatory or non-retaliatory basis for its actions, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  The plaintiff may attempt to establish that she was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence."  Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination."  Id. at 147.  Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'"  Id. (quoting Burdine, 450 U.S. at 255 n.10).  As the Reeves Court explained:

> Whether judgment as a matter of law is appropriate in any
> particular case will depend on a number of factors . . . includ[ing]
> the strength of the plaintiff's prima facie case, the probative value
> of the proof that the employer's explanation is false, and any other

> evidence that supports the employer's case and that properly may
> be considered on a motion for judgment as a matter of law.

Id. at 148-49.

Thus, if the employer meets its burden of proffering a nondiscriminatory impetus for its actions, then trial or summary judgment proceedings will center on whether a jury could infer discrimination from the following mix of evidence: (1) the plaintiff's prima facie case; (2) any evidence presented by the plaintiff to undercut the employer's proffered non-discriminatory impetus; (3) any other evidence of discrimination available to the plaintiff, including independent evidence of the employer's discriminatory statements or attitudes; and (4) any contrary evidence available to the employer, including evidence that the employer has a pattern of taking seriously its responsibilities of equal opportunity employment. Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the McDonnell Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253). Once the defendant has proffered a legitimate nondiscriminatory reason for its action, the question then becomes whether that proffered reason is a pretext for discrimination. At this point, the McDonnell Douglas burden-shifting framework is dissolved. The sole remaining issue is discrimination vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."

Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.

Examination of that issue in this setting therefore requires consideration of all the relevant

circumstances in evidence, including the strength of the prima facie case, any direct evidence of

discrimination, any circumstantial evidence that defendant's proffered explanation is false

(which, in conjunction with the prima facie case, may be sufficient to infer unlawful

discrimination), and any properly-considered evidence supporting the employer's case.  Reeves,

530 U.S. at 147-48; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir.

2004); Lathram, 336 F.3d at 1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

## ANALYSIS

Tsehaye's Complaint raises three claims:  (1) discrimination based on

Petree's conduct; (2) discrimination in his termination; and (3) retaliation by

termination for his prior complaints about Petree's conduct.[1]  These claims

arise under § 1981 and the DCHRA.  Smith has moved for summary

judgment, arguing that Tsehaye cannot establish a prima facie case for these

claims and that Tsehaye cannot show that Smith's proffered justifications for

its actions were a pretext for discrimination or retaliation.  The Court will

address each of Tsehaye's claims in turn.

## A.      Alleged Discriminatory Conduct of Petree

---

[1]Tsehaye's Complaint is replete with accusations that Petree harrassed him, although it does not
specifically state a cause of action for a hostile work environment.  Smith addressed such an argument in
its motion for summary judgment.  In response, Tsehaye referred to this issue as "a non-existing hostile
work environment claim."  Pl.'s Mem. Opp'n at 16.  Based on this statement, the Court concludes that
Tsehaye has not brought a hostile work environment claim, and the Court therefore will not address any
such claim.

To make out a prima facie case of discriminatory treatment, Tsehaye must establish that:  (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002); Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).  As set forth above, the McDonnell Douglas burden-shifting framework applies once Tsehaye has carried his burden of establishing a prima facie case.

Tsehaye's first claim is that the conduct of Petree, his supervisor, was discriminatory.  Specifically, Tsehaye alleges that Petree:  (1) wrongfully gave him disciplinary memoranda; (2) made statements that maligned his Ethiopian nationality and disparaged Ethiopians in general; (3) physically touched him in an aggressive fashion; (4) gave him inconsistent instructions and "unreasonable" deadlines; and (5) generally was rude toward him.  See Pl.'s Mem. Opp'n at 17-26.  All of these claims regarding Petree's conduct fail for the same reason:  Tsehaye cannot establish that he suffered an adverse employment action.  A prima facie case for discrimination requires an adverse employment action.  Stella, 284 F.3d at 145.

If a plaintiff has not suffered a reduction in benefits or pay, then an adverse personnel action can only be established if it is shown that the employer's action had "materially adverse consequences affecting the terms, conditions, or privileges of employment."  Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (quoting Brody, 199 F.3d at 457) (decision of district court reprinted with endorsement from D.C. Circuit panel)).  Indeed, "[a]n

'employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage.'" Id. (quoting Walker v. Washington Metropolitan Area Transit Authority, 102 F. Supp. 2d 24, 29 (D.D.C. 2000); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (stating that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"); Brody, 199 F. 3d at 457.

Tsehaye fails to show that he suffered an objectively tangible harm to the terms of his employment. He did not lose any pay or benefits, nor suffer any diminished responsibilities, as a result of Petree's conduct. Rather, he appears to have had the unfortunate experience of working under an overbearing micromanager. But without more, the law does not recognize this type of workplace unpleasantry as actionable. See, e.g., Mack v. Strauss, 134 F. Supp. 2d 103, 113-14 (D.D.C. 2001) (holding that plaintiff's allegedly increased workload was insufficient to support suit for discrimination in the absence of "some other adverse change in the terms, conditions, or privileges of employment"; standing alone, harassing and threatening treatment does not constitute actionable discrimination unless so pervasive and severe as to constitute a hostile work environment); Brodetski v. Duffey, 141 F. Supp. 2d 35, 47 (D.D.C. 2001) (stating that "[c]riticism of an employee's performance

unaccompanied by a change in position or status does not constitute adverse employment action").[2]

Tsehaye's complaints about Petree's disciplinary memoranda also fail to allege a tangible harm to the terms of his employment.  A reprimand that "amounts to a mere scolding, without any disciplinary action which follows, does not rise to the level of adverse action." Childers v. Slater, 44 F. Supp. 2d 8, 20 (D.D.C. 1999), vacated in part on other grounds, 197 F.R.D. 185, 191 (D.D.C. 2000); see also Stewart, 275 F.3d at 1136 (observing that "[t]his [c]ourt has held that formal criticisms or reprimands, without any additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions").  Although Tsehaye was eventually terminated by Smith, he did not suffer any change to the terms of his employment as a direct result of Petree's memoranda.  Accordingly, Tsehaye cannot establish the requisite element that he suffered an adverse employment action, and he necessarily fails to carry his prima facie case burden with respect to his independent claim that Petree's conduct constituted actionable discrimination.

## B.    Termination Discrimination Claim

Tsehaye's second claim is that his termination from his position as janitor was discriminatory.  The elements of a prima facie case for termination discrimination are identical to those for discriminatory treatment.

---

[2]The Court considers it appropriate to again mention that Tsehaye has disavowed any hostile work environment claim.  Pl.'s Mem. Opp'n at 16.

Termination from employment certainly qualifies as an adverse employment action, see Ellerth, 524 U.S. 742, 761 (1998), and there is no debate that, as an African of Ethiopian nationality, Tsehaye is a member of a protected class. Tsehaye has also sufficiently shown an inference of discrimination in his termination.  Thus, he has established a prima facie case for discrimination, and the burden now shifts to Smith to articulate a legitimate nondiscriminatory justification for terminating Tsehaye.  See McDonnell Douglas, 411 U.S. at 802.

Smith contends that Craig Channell, the resident manager of 2701, determined that costs were too high for that building and that payroll therefore needed to be reduced -- i.e., that one of the 2701 employees would have to be terminated.  Def. Mem. at 8-9; see also Channell Tr. at 60-61, 96; Pl.'s Exh. 25.  Channell further explained that he chose to terminate Tsehaye rather than Carter because Carter could do some of Tsehaye's work, but the converse was not true. Channell Tr. at 60-61.  Smith also contends that the problems between Tsehaye and Petree, in addition to the performance deficiencies identified by Channell, further justified Tsehaye's termination. Id.  These proffers satisfy Smith's burden under the McDonnell Douglas framework.  Thus, the burden shifts back to Tsehaye, and he must show that Smith's proffered nondiscriminatory motives are actually a pretext for discrimination.  See Reeves, 530 U.S. at 143.

Here, Tsehaye's first avenue of attacking Smith's proffered nondiscriminatory motives is to assert that neither 2701 nor Smith actually

suffered from financial distress.  Tsehaye provides a detailed analysis of

2701's financial condition, including a comparison to other Smith buildings.

Pl.'s Mem. Opp'n at 31-37.  Tsehaye draws a number of conclusions from this

analysis that call Smith's financial justification into question.  Id.  For

example, Tsehaye asserts that not only was 2701 not in financial distress, but

Smith hired both Carter and Petree after it had already identified concerns

regarding payroll costs, id. at 33, and it hired Ramos as a full-time employee

to replace Tsehaye after he was terminated, see id. at 25-27.  Tsehaye also

claims that payroll costs did not cause 2701 to lose money, and that the costs

per unit at 2701 were in step with those of other Smith buildings.  Id. at 33-

37.  Finally, Tsehaye asserts that Smith had to incur new expenses as a result

of his termination -- namely, landscaping costs -- and that this fact refutes the

suggestion that his termination was based on financial concerns.  See id. at 32.


Although Tsehaye presents a thorough argument for pretext, it is

ultimately unpersuasive.  Smith never claimed that 2701 was in danger of

financial insolvency; rather, Smith claimed that it assessed the monthly costs

per unit at 2701 and did not think them prudent. Essentially, Smith no longer

wished to continue shelling out the same amount of money for 2701's payroll.

Tsehaye offers no reason to disbelieve this non-discriminatory justification

for his termination.  This is a legitimate financial business decision, and the

Court will not second guess it.  See Hardin v. Hussman Corp., 45 F.3d 262,

265 (8th Cir. 1995) (stating that "when a company's decision to reduce its

workforce is due to the exercise of business judgment, it need not provide

evidence of financial distress").  An employer is not legally required to face

financial collapse before downsizing its staff.  Smith determined that 2701

was not earning as much money as it wanted the building to earn, and the

termination of plaintiff was part of a larger attempt to maximize Smith's

profits.  Thus, Tsehaye's evidence, putting aside any questions of its

competence or accuracy,[3] is not convincing.

The remainder of Tsehaye's attempts to rebut Smith's proffered

financial justification for Tsehaye's termination also fall short.  To begin with,

the Court is not particularly troubled by the fact that Smith hired Petree and

Carter even after the desire to maximize 2701's profits arose.  See Pl.'s Mem.

Opp'n at 32.  Petree and Carter were hired because Smith needed to fill staff

vacancies at that time and to make 2701 function properly again following

the extended stretch of poor management.  See Channell Tr. at 96.  Smith

may have determined that, notwithstanding the fact that 2701 would have

been more profitable if it continued to operate short-handed, the immediate

---

[3]Smith has moved to strike Tsehaye's evidence -- most notably, the evidence that Tsehaye submitted to refute Smith's financial justification for his termination -- based on a variety of evidentiary shortfalls, e.g., that it is unauthenticated, irrelevant, inadmissible hearsay, or lacks a proper basis of personal knowledge. See Def.'s Mot. to Strike.  To defeat a motion for summary judgment, a non-movant is not required to submit trial-quality evidence.  However, the evidence must be capable of conversion into evidence that would be admissible at trial.  See, e.g., Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000) (stating that "plaintiff's evidence about the conversation is sheer hearsay; . . . [i]t therefore counts for nothing"); see also Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7 (D.C. Cir .1998) (stating that "[a]n affidavit . . . consisting entirely of inadmissible hearsay is not sufficient to defeat summary judgment"); Wilson v. Dana Corp., 210 F. Supp.2d 867, 873 (W.D. Ky. 2002) (stating that on a motion for summary judgment in a hostile work environment case, "hearsay ... will not be considered by the court").  Nonetheless, the Court's disposition of this case does not rest on any of the evidence that Smith has isolated; accordingly, it is unnecessary to strike it.

objective of fixing the building's operational infrastructure was worth the delay in fiscal savings.  See id.  That, again, would be a legitimate business decision.  Whether it was wise or unwise is not something this Court will address.  The question for the Court is whether it was pretextual and thus discriminatory.

The fact that Ramos was hired to replace Tsehaye after his termination is also insufficient to negate Smith's proffered financial justification.  Ramos was actually only hired full-time after Tsehaye was discharged.  Ramos had been working at 2701 four hours per day; once Tsehaye left, Ramos' hours were bumped up to eight hours per day.  See Pl.'s Mem. Opp'n at 26-28; Pl.'s Exh. 12. The additional cost to Smith was therefore just four hours per day: the equivalent of hiring a part-time worker.  Combined, the termination of Tsehaye and expansion of Ramos' hours resulted in a net cost savings to Smith of four hours per day.  Thus, the fact that Ramos was employed at 2701 full-time after Tsehaye was discharged does not show that Smith was not trying to maximize 2701's profits.  To the contrary, it shows that Smith cut back on the total hours of paid employment.

Finally, the fact that Smith incurred landscaping costs after Tsehaye's discharge is also unremarkable, as Smith had incurred similar landscaping costs in the past.  Smith never stated that its decision to fire Tsehaye rested solely on financial concerns; rather, it appears to have been predicated on the overall mix of circumstances, including:  (1) a desire to maximize 2701 profits in particular; (2) a desire to maximize Smith profits generally; (3)

problems with Tsehaye's work ethic and attitude; (4) problems with Tsehaye's job performance; and (5) the incurable personality conflict between Tsehaye and Petree.  Thus, Smith -- in its business judgment -- could reasonably have decided that Tsehaye's continued employment at 2701 was not worth the modest fiscal advantage flowing from his ability to perform landscaping duties.

Tsehaye's second avenue of attack concerns his own work performance. On this point, Tsehaye's evidence consists mainly of his own subjective assessment of his performance.  Even if that evidence were proper, it would still be insufficient to establish pretext.  See, e.g., Keeley v. Small, -- F. Supp. --, 2005 WL 2304162 at *16 (D.D.C. 2005) (citing Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 7 (D.D.C. 2000), aff'd, Waterhouse, 298 F.3d at 992-993)).  The Court is not concerned with whether Smith's proffered nondiscriminatory justifications are in fact the reasons why Tsehaye was discharged;  relief under the law exists not when the defendant's proffers are merely *pretextual*, but rather when they are pretexts *for discrimination*.  See Murray, 406 F.3d at 713 (describing the pretext analysis as two-fold, requiring a determination whether a reasonable jury could infer that the employer's proffered nondiscriminatory motive is pretextual, and, if so, whether a reasonable jury could infer that the pretext shielded a discriminatory animus); cf. Aka, 156 F.3d at 1291 (stating that material questions regarding whether the employer's nondiscriminatory justification for its actions is true will not suffice to support an inference of discrimination if the plaintiff has established pretext in a way that supports an inference of a different nondiscriminatory motivation, or if the plaintiff has only weakly shown

that the employer's reason could be false and the record contains ample evidence that no

discrimination was involved).  Even assuming that Tsehaye has established that

Smith did not fire him because it wanted to maximize 2701's profits, and that

Tsehaye was a paradigm of janitorial perfection, there is still no legally

cognizable harm.  Tsehaye must show that the real reason for his termination

was his nationality or race, not that Smith harbored an intense and

conspiratorial disdain for him.


**C.      Retaliation Claim**

To make a prima facie showing of retaliation, Tsehaye must establish

that:  (1) he was engaged in a statutorily protected activity; (2) Smith took an

adverse personnel action against him; and (3) there is a causal nexus between

Tsehaye's engagement in the protected activity and Smith's adverse personnel

action.  Brody, 199 F.3d at 452; Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C.

Cir. 1985); McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984).

The McDonnell Douglas burden-shifting framework applies once Tsehaye

has made his prima facie case.

Tsehaye's complaint of discrimination to a superior at Smith suffices as

a protected activity:  the law does not require a formal EEOC or court filing.

See, e.g., Jones v. Washington Metropolitan Area Transit Auth., 205 F.3d

428, 433 (D.C. Cir. 2000) (affirming lower court's finding of retaliation based

on letter sent by employee to employer's manager, which described

discrimination practices against Caucasian women); McKenna, 729 F.2d at

791 (finding retaliation where employee orally complained to superiors about sexism). Thus, Tsehaye's escalation to Smith's Human Resources Department by filing a discrimination grievance against Petree constitutes a statutorily protected activity. Smith also knew about the complaint, as it was filed at Smith's headquarters with Smith employees, a Smith supervisor accompanied Tsehaye when he made the complaint, and a Smith personnel manager met with Tsehaye as a result of the complaint. When Smith terminated Tsehaye's employment, Smith took an adverse employment action against him. Thus, Tsehaye clears the first two hurdles for proving a prima facie case.

Tsehaye has also satisfied the third hurdle: he has successfully shown a causal nexus between his protected activity and Smith's adverse personnel action. A plaintiff may establish causation by demonstrating a sufficiently close temporal proximity between an employer's knowledge of protected activity and an adverse employment action. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Here, the key inquiry focuses on the length of time between the two. See, e.g., Childs-Pierce v. Utility Workers Union of America, -- F. Supp. 2d --, 2005 WL 1983577 at *13 (D.D.C. 2005). Courts diverge on the issue of how short the length of time must be, compare Mitchell, 759 F.2d at 86-87 (holding that the passage of three months between the employee's protected activity and the employer's adverse personnel action is sufficient to establish causation for purposes of the plaintiff's prima facie burden), and Castle v. Bentsen, 867 F. Supp. 1, 3 (D.D.C. 1994) (stating that a gap of three to five months may support a

finding of causation), with Kipp v. Missouri Highway & Transp. Comm'n,
280 F.3d 893, 897 (8th Cir. 2002) (holding that a two-month interval is too
attenuated to support a finding of causation), and Baker v. Potter, 294 F.
Supp. 2d 33, 41 (D.D.C. 2003) (stating that a two-month interval is
insufficient to support the finding of a causal nexus).

There are a myriad of reasons why Smith may have decided to
terminate Tsehaye's employment.  But the fact remains that Tsehaye filed the
discrimination grievance at Smith's headquarters with Ms. Longmore on May
27, 2003, and he was promptly terminated less than one month later, on June
22, 2003.  This interval of twenty-six days certainly suffices to establish an
inference of causation where, as here, the adverse employment action taken --
final termination -- was severe.  See Childs-Pierce, 2005 WL 1983577 at *13
(holding that interval of nine weeks was sufficient to support finding of
causation in part due to the severity of the adverse employment action).
Thus, Tsehaye has established a prima facie case of retaliation.

Nevertheless, this is as far as Tsehaye may go under the law.  Tsehaye's
Achilles heel is again the inability to prove pretext on the part of Smith.
Tsehaye cannot, for the reasons discussed earlier in connection with the
termination discrimination claim, make the requisite showing that Smith's
proffered justifications for his discharge were a pretext *for discrimination*, rather
than a pretext for something else.  See, e.g., Murray, 406 F.3d at 713.  Accordingly,
Tsehaye has failed to carry his ultimate burden under the McDonnell Douglas
framework.

## CONCLUSION

For the reasons discussed above, Smith's motion for summary judgment is granted. This case is accordingly dismissed.  A separate Order has been issued on this day.


_____/s/ John D. Bates_____

JOHN D. BATES

United States District Judge


Dated:   _September 26, 2005_____

Copies to:

Anne J.A. Gbenjo

THE GBENJO LAW GROUP
8449 West Bellfort Avenue
Suite 100
Houston, TX 77071
(713) 771-4775
Fax: (713) 771-4784
Email: annegbenjo@juno.com
    *Counsel for plaintiff*

Connie Nora Bertram
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
(202) 282-5000
Fax: (202) 282-5100
Email: cbertram@winston.com

Patricia A. Exposito
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
(202) 282-5000
Fax: (202) 282-5100
Email: pexposito@winston.com
    *Counsel for defendant*